## EUGENE FLOWERS v. STATE.

No. A-2257.   Opinion Filed March 20, 1917.

(163 Pac. 558.)

1   **PERJURY—Oath—Violation.** A witness, sworn to tell the truth, and the whole truth, violates his oath if he knowingly, willfully, and corruptly conceals any part of the truth, material to the issue concerning which he is questioned. For a half truth does not fulfill the requirements of his oath, and constitutes perjury of the most dangerous character.

2.   **SAME—Evidence—Sufficiency.** The evidence examined, and **held** that the appellant's own testimony is tantamount to a plea of guilty.

*Error from District Court, Wagoner County;*
*R. C. Allen, Judge.*

Eugene Flowers was convicted of perjury, and he brings error. Affirmed.

*P. E. Reed,* for plaintiff in error.

*R. McMillan,* Asst. Atty. Gen.; for the State.

BRETT, J.   In this case the plaintiff in error, whom we shall call defendant, as he appeared in the lower court, was convicted of perjury and sentenced to serve six months in the penitentiary. The defendant was a deputy sheriff of Wagoner county. And a large quantity of whiskey and spirituous liquor had been seized from time to time by the officers, and securely locked up in a cell in the county jail. And from the record it appears that J. E. Long, sheriff of the county, through other parties, corruptly and surreptitiously sold this liquor to one Studevant; and on the night of June 10, 1911, arranged for it to be secretly delivered to him. There were two wagon-loads of the liquor, and Studevant paid $370 for it. The de-

fendant was called before the grand jury later, to give information as to what he knew about this transaction, and denied any knowledge whatever concerning it, and further stated that he knew of no one who did know anything about it. And this charge of perjury is based upon his testimony before the grand jury.

The material facts relied upon by the state to prove that the defendant swore falsely before the grand jury are: That on the night the whiskey was taken from the jail, Bill Conners, the party employed to take it from the jail and deliver it to Studevant, came to the defendant's house, and asked him if everything was all right; that he answered that it was; that Conners testified that only two or three days before that he had had a conversation with the defendant with reference to getting this whiskey; that next morning Conners, while on his way to the residence of Studevant to collect for the whiskey, met the defendant, who was on his way to town, and told him he was then going after the money for the whiskey, to which the defendant replied: "All right, I will be back after a bit"; that after collecting the money Conners returned to his own home; and the defendant later went there, and received the $370 and gave $100 of it back to Conners and put the other $270 in his pocket and left; that defendant met the sheriff on the street before reaching the courthouse, and handed him the roll of money, and the sheriff took $25 from the roll of bills, and gave it to the defendant, and told him to hand it to Charley Smith, the undersheriff.

The defendant, as a witness in his own behalf, denied some of the details, as testified to by the witnesses for the state, but admitted that Conners gave him the roll of greenbacks, and told him to give it to the sheriff.

But he says that when Conners gave him the money, he "was dumbfounded," but did not make any inquiry as to what it was for, or where it came from, but only said, "Bill, you go and make that delivery to Jim Long." He admitted that he then took the money, and delivered it to the sheriff, and said, "Here, Mr. Long, are your keys, and this money that Bill Conners told me to give you." And he says, "I looked him right straight in the eye, and Jim kinder ducked his head and smiled." And that when he turned to walk off, "Jim says 'Wait a minute,' and called me back, and tore off two tens and a five, and says, 'Give this to Charley Smith,' and I did it." And Charley Smith took the money without any appearance of being dumbfounded, and even without a' question or a smile. There are many other incidents, proven by the state and admitted by the defendant, that show he swore falsely before the grand jury.

1: But with these facts locked up in his breast, the defendant went before the grand jury, and testified that he had no knowledge of the sale of this liquor, and did not know of any one that had anything to do with it, or knew anything about it, and on the trial of this case tries to justify that statement on the grounds: First, that he was not personally present when the deal was made, and consequently had no personal knowledge of its details; and, second, that the grand jury did not ask him specifically about Conners coming to his house that night, or about the roll of money delivered by Conners to him, and then by him to the sheriff, but says, "If they had asked me these questions, I certainly would have told them along with other stuff too numerous to mention"; for, he says, "This ain't a starting point." But the defendant knew that the oath he took was to tell the truth

and the whole truth. And he knew that in concealing these facts he was violating that oath. He knew that these facts were material to the issue under investigation, and that they were concealed in his own breast, and he knew that it was because the grand jury did not know these facts that they had called upon him, and asked him for whatever information he had, or if he did not know before, perhaps he will learn that a half truth does not fulfill the requirements of his oath. It does in most instances amount to a falsehood, and is the most dangerous character of perjury, and under that oath no man has the right to willfully, knowingly, and corruptly suppress any part of the truth, material to the issue concerning which he is questioned.

2. Besides, the defendant swore positively that he knew nothing about the matter under investigation, and his own testimony in this case shows that he had concealed in his breast the exact information the grand jury were seeking, and which, under his oath and the questions asked, it was his duty to divulge. A plainer case of perjury could not have been made. And the defendant's own testimony is tantamount to a plea of guilty.

We have carefully read the briefs and the entire record, and think the only serious mistake made was in the extremely small penalty imposed upon the defendant by the jury, for one of the most dangerous and detestable of crimes.

The judgment is therefore affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.